UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

PAUL STEPHANSKI,

                              Plaintiff,                      9:18-cv-0076 (BKS/CFH)

v.

RANDY ALLEN, Sergeant, Cape Vincent Correctional
Facility; THOMAS STACKLE, Correctional Officer, Cape
Vincent Correctional Facility; and BRANDON PAYNE,
Correctional Officer, Cape Vincent Correctional Facility,

                              Defendants.
_____

**Appearances:**

*For Plaintiff*:
Gabriel M. Nugent
John Joseph Pelligra
Barclay Damon LLP
Barclay Damon Tower
125 East Jefferson Street
Syracuse, NY 13202

*For Defendants:*
Letitia James
Attorney General of the State of New York
Aimee Cowan
Assistant Attorney General
300 South Street
Suite 300
Syracuse, NY 13202

**Hon. Brenda K. Sannes, United States District Judge:**

MEMORANDUM-DECISION AND ORDER

I.      INTRODUCTION

        Plaintiff pro-se Paul Stephanski, a former inmate of the New York State Department of

Corrections and Community Supervision ("DOCCS"), brought this action against Defendant

Randy Allen, a sergeant at Cape Vincent Correctional Facility ("Cape Vincent"), and Defendants Thomas Stackle and Brandon Payne, corrections officers at Cape Vincent, under 42 U.S.C. § 1983 alleging that Defendants violated the Eighth Amendment by subjecting Plaintiff to excessive force and failing to protect him while Plaintiff was an inmate at Cape Vincent. (Dkt. No. 1).

On June 26, 2019, Defendants filed a motion for summary judgment seeking dismissal of the complaint based upon Plaintiff's failure to exhaust administrative remedies. (Dkt. No. 39). This matter was referred to United States Magistrate Judge Christian F. Hummel who issued a Report-Recommendation on January 22, 2020 recommending that Defendants' motion for summary judgment be denied. (Dkt. No. 48). Magistrate Judge Hummel found "sufficient evidentiary support to withstand Defendants' motion for summary judgment for [Plaintiff's] claim that he attempted to file a grievance at Cape Vincent." *Stephanski v. Allen*, No. 18-cv-76, 2020 WL 806331 at *9, 2020 U.S. Dist. LEXIS 11028, at 24-25 (N.D.N.Y. Jan. 22, 2020). Magistrate Judge Hummel concluded that "[v]iewing the facts in the light most favorable to Stephanski, the record suggests that he submitted grievances while confined in the Cape Vincent C.F. SHU, but the grievances were unfiled and unanswered, creating an issue of material fact as the availability of the grievance process, and, thus, whether administrative remedies were available to him." *Id*. at *10, 2020 U.S. Dist. LEXIS 11028, at *31. On February 18, 2020 the Court adopted the Report-Recommendation in its entirety. (Dkt. No. 49).

The Court appointed counsel for Plaintiff and, on August 25, 2020, held an evidentiary hearing on the issue of exhaustion. Both parties submitted letter briefs following the hearing. (Dkt. Nos. 72, 73). For the reasons set forth below, the Court finds that the grievance procedures were unavailable to Plaintiff and that his claims are thus not barred by the Prison Litigation

2

Reform Act ("PLRA"), 42 U.S.C. § 1997e(a) based upon a failure to exhaust administrate remedies. Accordingly, Plaintiff's claims shall proceed to trial.

## II.     BACKGROUND[1]

Plaintiff has alleged the following. On September 30, 2015, Plaintiff was in the Cape Vincent Special Housing Unit ("SHU"). (Dkt. No. 1, ¶ 1). At approximately 5:30 p.m., Plaintiff smoked a cigarette, which is forbidden. (Dkt. No. 39-2, at 26-27). Defendants Payne and Stackle came to Plaintiff's cell, and told Plaintiff to put his hands through the hatch to be handcuffed. (*Id*. at 30). Plaintiff complied, and was handcuffed with his hands behind his back. (*Id*. at 30-31). One of the officers directed Plaintiff to "go to the center of the cell," which he did. (*Id*. at 34). Then, "the door came open and they rushed in." (*Id*.). Stackle "pushed [Plaintiff] to the corner of the room" while Payne searched the cell for the contraband. (*Id*.) Stackle asked Plaintiff where the cigarette was, and when Plaintiff told him "it's gone," Stackle "punched [Plaintiff] twice in the ribcage." (*Id*.). Payne then proceeded to punch Plaintiff "six to eight times in the middle of [his] back" while asking "where is it?" (*Id*. at 34, 38). Plaintiff responded that "it was gone," and Stackle finished searching the cell. (*Id*. at 38). Plaintiff was then forcibly removed from the cell. (*Id*.).

Plaintiff further alleges that Payne and Stackle escorted Plaintiff to the "strip frisk room" where they were met by Allen at the door. (*Id*. at 41). Plaintiff "wound up on the floor somehow," with Allen "grabbing [his] right leg" and asking "why'd you lie to me." (*Id*. at 43). Allen then punched Plaintiff about "eight times in the back of [his] right leg while C.O. Payne [twisted Plaintiff's] right ankle and C.O. Stackel [*sic*] was mushing [Plaintiff's] face into the

---

[1] The facts have been drawn from Plaintiff's Complaint, (Dkt. No. 1), and deposition testimony and exhibits attached to Defendants' motion for summary judgement, (Dkt. Nos. 39-2, 39-4, 39-8).

3

floor." (*Id*.). Plaintiff alleges that as a result of the alleged assault, he could not move or eat for three days because "every time [he] moved or every time [he] coughed, [his] ribs hurt." (*Id*. at 50). Plaintiff received an x-ray on November 18, 2015, after his transfer to Southport Correctional Facility ("Southport"), which showed he had two fractured ribs. (Dkt. No. 1, ¶ 23).[2] Plaintiff alleges that he had difficulty breathing for "about five months" after the incident. (*Id*. at 50).

### III.   DISCUSSION

#### A.   Exhaustion of Administrative Remedies

The PLRA provides that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). This exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). To properly exhaust his administrative remedies, an inmate must complete the administrative review process in accord with the applicable state procedural rules. *Jones v. Bock*, 549 U.S. 199, 218-19 (2007).

The grievance procedure in New York is generally a three-tiered process. An inmate must first file a grievance with the Inmate Grievance Resolution Committee ("IGRC") within twenty-one days of the incident. N.Y. Comp. Codes R. & Regs. (NYCRR) tit.7, §§ 701.5(a)(1), (b). An adverse decision of the IGRC may be appealed to the Superintendent of the Facility, *id.* at § 701.5(c), and adverse decisions at the Superintendent's level may be appealed to the Central

---

[2] Defendants dispute that the injuries reflected in the x-ray report "nearly two months after the alleged incident" were sustained during the alleged incident. (Dkt. No. 72, at 6).

4

Office Review Committee ("CORC"). The appeal to CORC must be submitted within seven days after receipt of the Superintendent's decision. *Id.* at § 701.5(d)(1)(i).

Because "[a]llegations of employee harassment are of particular concern," there is an expedited procedure for harassment grievances. *Id.* at § 701.8. Such grievances are forwarded directly to the prison superintendent, who determines "whether the grievance, if true, would represent a bona fide case of harassment." *Id.*; *see also Torres v. Carry*, 691 F. Supp. 366, 369-70 (S.D.N.Y. 2009). If the grievance presents a "bona fide harassment issue," "then the superintendent must initiate an investigation, render a decision on the grievance, and inform the inmate of the decision within 25 days of receipt of the grievance." *Williams v. Priatno*, 829 F.3d 118, 120 (2d Cir. 2016); NYCRR tit.7, §§ 701.8(d), (f). The superintendent's decision may be appealed by filing a "notice of decision to appeal form (Form 2133)" with "the inmate grievance clerk within seven calendar days of receipt of that response." *Id*. § 701.8(h). However, "[i]f the superintendent fails to respond within the required 25-day time limit the grievant may appeal his/her grievance to CORC." *Id*. § 701.8(g). "This is done by filing a Notice of Decision to Appeal (Form 2133) with the inmate grievance clerk." *Id.*

"Under the PLRA, a prisoner need exhaust only 'available' administrative remedies." *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016). The Supreme Court has identified three examples of unavailable administrative procedures: (1) those that "operate[] as a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates; (2) those that are "so opaque that [they] become[], practically speaking, incapable of use," where "some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it;" and (3) those where "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1859-60.

Failure to exhaust administrative remedies is an affirmative defense; accordingly, a defendant bears the burden of persuasion on whether a plaintiff failed to satisfy the exhaustion requirements. *See Jones*, 549 U.S. at 216; *Hubbs v. Suffolk Cty. Sheriff's Dep't*, 788 F.3d 54, 59 (2d Cir. 2015); *Nelson v. Plumley*, No. 12-cv-422, 2015 WL 4326762, at *7, 2015 U.S. Dist. LEXIS 91905, at *20 (N.D.N.Y. July 14, 2015) ("As an affirmative defense, the party asserting failure to exhaust administrative remedies typically bears the ultimate burden of proving its essential elements by a preponderance of the evidence.") (citation omitted). The defendant discharges its initial burden of production by "demonstrating that a grievance process exists" and that the plaintiff failed to utilize the grievance procedure. *White v. Velie*, 709 F. App'x 35, 38 (2d Cir. 2017) (summary order); *Williams*, 829 F.3d at 126 n.6. ("[D]efendants bear the initial burden of establishing the affirmative defense of non-exhaustion by pointing to legally sufficient sources such as statutes, regulations, or grievance procedures which demonstrate that a grievance process exists and applies to the underlying dispute.") (internal quotation marks omitted). The burden of production then shifts to the plaintiff, who must show that "other factors rendered a nominally available procedure unavailable as a matter of fact." *Hubbs*, 788 F.3d at 59; *see Ross*, 136 S. Ct. at 1856 ("Under the PLRA, a prisoner need exhaust only 'available' administrative remedies.").

In *Williams*, the Second Circuit addressed whether an inmate whose grievance was unfiled and unanswered had satisfied the PLRA's exhaustion requirement. Williams alleged that while incarcerated at Downstate Correctional Facility, he was assaulted by corrections officers. 829 F.3d at 120. He was placed in SHU after the assault, where he drafted a grievance "detailing the officers' misconduct." *Id*. Williams "gave the grievance to a correction officer to forward to the grievance office on his behalf, in accordance with DOCCS grievance procedures that apply

6

to inmates in the SHU." *Id*. at 120-21 (citing NYCRR tit. 7, § 701.7). A week later, Williams informed the superintendent of Downstate Correctional Facility that he had not received a response to his grievance, and she responded that "she had no knowledge of the grievance and that she would look into it." *Id*. at 121. A week after that, Williams was transferred to another facility. *Id*. Williams never received a response to the grievance and alleged that the correction officer he gave it to never filed the grievance. *Id*.

Accepting the allegations in the complaint as true, the Second Circuit reversed the district court's dismissal of the complaint for failure to exhaust. The Second Circuit noted that the regulatory scheme "contemplate[s] appeals of grievances that were actually filed," and found that "the regulations plainly do not describe a mechanism for appealing a grievance that was never filed." *Id*. at 126. The Court found that because "the process of appealing an unfiled grievance is practically unavailable to inmates under current" regulations, defendants failed to meet their "initial burden" of establishing that a grievance process applied to the underlying dispute. *Id.* at 126 n.6. In *Williams*, the obscurity of the regulations "was compounded by the fact that Williams was transferred to another facility approximately two weeks after giving his grievance to the corrections officer," and "[t]he regulations plainly do not provide guidance on how a transferred inmate can appeal his grievance with the original facility without having received a response." *Id*. at 126. The Court concluded that "the grievance procedures that were technically available to Williams are so opaque and confusing that they were, 'practically speaking, incapable of use.'" *Id*. (quoting *Ross*, 136 S. Ct. at 1859). Therefore, "in giving his grievance to the correction officer, [the plaintiff] exhausted all administrative remedies that were available to him." *Id*.

Following *Williams*, this Court has found that the grievance appeal process is unavailable to inmates who have submitted grievances that were unfiled and unanswered. *See Hamlett v. Stotler*, 17-cv-0939, 2019 WL 4306999, at *9, 2019 U.S. Dist. LEXIS 142026, at *26 (N.D.N.Y. Aug. 15, 2019) (applying *Williams* and holding that administrate remedies were unavailable for an inmate who submitted a grievance that was unfiled and unanswered), *report recommendation adopted*, 2019 WL 4305449, 2019 U.S. Dist. LEXIS 154525 (N.D.N.Y. Sept. 11, 2019); *Zulu v. Barnhart*, 16-cv-1408, 2019 WL 2997226, at *13, U.S. Dist. LEXIS, at *34 (N.D.N.Y. April 22, 2019) (finding that the grievance appeal process was unavailable where "plaintiff credibly met his burden of production by documenting his efforts to file grievances"), *report recommendation adopted*, 2019 WL 2150628, 2019 U.S. Dist. LEXIS 83511 (N.D.N.Y. May 17, 2019); *Coleman v. Nolan*, 15-cv-40, 2018 WL 4732778, at *8-11, 2018 U.S. Dist. LEXIS 169979, at *29 (Oct. 2, 2018) (finding that *Williams* establishes that grievance process was unavailable where "plaintiff credibly testified that, despite two attempts, plaintiff's grievances with respect to defendant['s] alleged assault were never filed"); *see also Trahan v. Capozzola*, No. 12-4353, 2017 WL 9512406, at *5, 2017 U.S. Dist. LEXIS 99594, *14-16 (E.D.N.Y. June 26, 2017) (denying motion for summary judgment with respect to an unfiled and unanswered grievance because the defendants failed to meet their initial burden of showing that a grievance process exists and applies to the underlying dispute).

### B.     Evidence Regarding Exhaustion

Here, the evidence establishes that the DOCCS grievance procedures applied at Cape Vincent in 2015, and that there was no record of a grievance filed by Plaintiff while at Cape Vincent concerning the September 30, 2015 incident. (Dkt. No 70, at 7-8, 101-02, 116). The issues to be decided are whether the Plaintiff submitted a grievance that did not reach the grievance department at Cape Vincent and, if so, whether there were grievance procedures

8

available to Plaintiff under such a circumstance. Four witnesses testified for Defendants at the August 25, 2020 evidentiary hearing: Defendant Thomas Stackle, Defendant Brandon Payne, DOCCS Inmate Grievance Program Assistant Director Rachel Seguin, and Cape Vincent Correctional Facility Inmate Grievance Supervisor Tami Hartz. Plaintiff testified but called no other witness.

Plaintiff testified, and the records reflect, that following the incident he was in "special watch," with a special watch officer outside of his cell. (Dkt. No. 70, at 75, 124-25; Pl. Ex. 12). According to Plaintiff, in special watch inmates do not have access to a pen or paper to file a grievance. (Dkt. No. 70, at 124-25). Plaintiff testified that he filed a grievance after he returned to the SHU where "you can file grievances." (*Id*. at 11, 125). Plaintiff testified that while he was in SHU he submitted two grievances between October 7 and October 9, 2015, but that they "never made it to [their] destination, which is the grievance department." (Dkt. No. 70, at 9).

Plaintiff testified that he submitted the first grievance "around" October 7, 2015, after getting back to the SHU, and that he drafted it on plain paper and not a grievance form. (*Id*. at 43-44). He submitted the second grievance "probably around" October 9, 2015. (*Id*. at 44). Plaintiff submitted a second grievance because he had not heard back from the first one and, given the seriousness of the incident, he was concerned "they didn't get responded to because they never . . . reached the destination." (*Id*. at 44-45). Plaintiff did not make copies of either of the grievances he submitted at Cape Vincent because he did not have carbon paper. (*Id*. at 43, 48). Plaintiff testified that inmates in SHU hand grievances "to a CO" when mail is called. (*Id*. at 25, 49). Inmates "stand[] by their door" and hand their mail out through the "feed-up hatch" to the correction officer tasked with collecting the mail. (*Id*. at 49-50). Plaintiff placed each grievance through the "feed-up hatch" when mail was called, where it was collected by a

9

corrections officer. (*Id*. 49-50). Plaintiff does not know which officer collected his grievances. (*Id*. at 51).

Defendant Payne described two ways that an inmate in SHU can file a grievance. An inmate can drop a grievance in the mail, and then it is "placed in a mailbag and taken up front," or "Mrs. Hartz [the Inmate Grievance Program Supervisor] comes around and she could collect it from the door." (*Id.* at 84). The midnight shift officers collect the mail and drop it in the mailroom when they leave at 7 a.m. (*Id.*). Payne does not believe that the mailbag is sealed. (*Id.*). Hartz testified that she typically gets grievances from inmates through the mail; she picks up the mail in the mail room and takes it to her office. (*Id.* at 98). She testified that she made weekly rounds in SHU, and that if there was an inmate who wanted to speak to her she would stop and speak with him. (*Id.* at 100-101). Hartz could not "specifically recall" if she had done so in September and October of 2015. (*Id*. at 108).

There was no direct evidence of tampering. Defendant Payne testified that he collected mail from inmates "very rarely," (*id*. at 84), but that he did not intercept or destroy any grievances filed against him by Plaintiff, or instruct anyone else to do so, (*id*. at 87). Payne did not recall if he collected mail during September and October 2015. (*Id*. at 89-90). He also did not recall whether he had ever picked up mail from Plaintiff's cell, saw him write a grievance, or draft any documents. (*Id*. at 91). Payne was aware that Plaintiff "made a statement to the captain" about the September 30, 2015 incident, but was unaware of whether he filed a grievance. (*Id*. at 93-94).

Defendant Stackle testified that he did not play any role in collecting inmate mail. (Dkt. No. 70, at 72). He testified that he did not try to intercept or destroy any grievances filed by

10

Plaintiff, or direct any other officers to do so. (*Id*. at 73). Stackle testified that in his position he would have no knowledge of whether Plaintiff drafted or filed a grievance. (*Id*. at 79-80).

A few weeks after the alleged incident, Plaintiff reported it to Captain Hanson. (*Id*. at 14). This led to Lieutenant Bass's interview of Plaintiff on October 17, 2015. (*Id*.; Def. Ex. 11). Lt. Bass prepared a report of his interview. (Def. Ex. 11). The report states that when Lt. Bass asked Plaintiff why he waited "2 weeks to make this complaint," Plaintiff replied that "he didn't make a complaint; he had only said it to the captain." (*Id*.). The report further states that Plaintiff said he "was waiting to get out of the jail before he filed a complaint and didn't know it would be investigated." (*Id*.). Plaintiff disputed this report. Plaintiff testified that it was not true that he did not make a complaint, and that it was also not true that he was waiting to get out of jail before filing a complaint. (Dkt. No. 70, at 124).

Plaintiff introduced an inmate injury report which shows that Plaintiff was seen by a nurse the day after Lt. Bass's interview. (Pl. Ex. 1). The report notes that Plaintiff reported that his ribs were tender, and that the nurse observed bruising on the back of his head. (*Id.*).[3]

Plaintiff could not recall whether he wrote any letters inquiring about the status of his grievance while at Cape Vincent, but thought he may have. (*Id*., at 15). There was no evidence of any such letter. Plaintiff was transferred to Southport on November 6, 2015. (*Id*.). Once at Southport, Plaintiff sent a letter to Cape Vincent inquiring about the grievance. (*Id*.). In an undated letter addressed to the Cape Vincent Grievance Committee, and received by Hartz on November 30, 2015, Plaintiff stated that he "wrote a Grievance on a Assault that took Place in your Box against C.O. Stackle, C.O. Payne and Sgt. Allen" and asked "what is the status on that

---

[3] X-rays taken on November 18, 2015, after Plaintiff had been transferred to the Southport Correctional Facility, showed "[n]ondisplaced fracture of the right ninth and possibly eight ribs." (Pl. Ex. 2).

11

grievance." (Def. Ex. 1). Hartz responded in a letter dated that same day informing Plaintiff that a "review of the IGRC log reveals there is no record of a grievance from you in 2015." (Def. Ex. 2).[4]

Plaintiff submitted a grievance dated November 27, 2015 to grievance officials at Southport regarding the September 30, 2015 incident. (Def. Ex. 4). In the grievance, he wrote: "I also filed a grievance got no response. I also wrote and reported it to IG in Albany—still haven't heard anything so now I file this at Southport C.F." (*Id.*). In an "action required" section Plaintiff asked that "CO's walk w/ locked mailbox when collecting mail to be sure it is not being tampered w/ like my grievance and letter." (*Id.*).

Plaintiff testified that the Southport grievance official, Ms. Martin, "kicked [the grievance] back to me" as untimely, and that he then wrote a follow-up letter. (Dkt. No. 70, at 58). Plaintiff captioned his letter, dated December 2, 2015, "Grievance not filed / Cape Vincent." (Def. Ex. 3). Plaintiff stated that he was "returning this grievance due to the fact I do not know if Cape Vincent Correctional Facility filed my original complaint." (*Id.*). Plaintiff requested that his Southport grievance be given "a number," noting "[t]he mitigating circumstance is it was filed at Cape Vincent which I don't think they filed it," and that it was "ok" if this grievance was considered untimely. (Def. Ex. 3).

Plaintiff's grievance was denied because "Cape Vincent CF has advised that no grievance concerning this issue was ever received and filed," and "the issues in his complaint are now beyond the timeframes established" in the DOCCS regulations. (Pl. Ex. 7). Plaintiff appealed this decision to the Superintendent at Southport, who denied his appeal for the same reason, and then

---

[4] The record does not reflect when Plaintiff wrote the undated letter that was received by Hartz on November 30th. The last date to request an exception to the twenty-one -day time limit for filing a grievance was November 14, 2015. (Def. Ex. 10).

Plaintiff appealed to CORC. (Pl. Ex. 8). In his appeal statement, Plaintiff said that he was appealing to CORC "due to Cape Vincent not filing grievance." (*Id.*). CORC denied the appeal because Plaintiff's complaint was submitted beyond the forty-five-day time period within which the grievance officials could grant an extension for filing a grievance. CORC noted that "[Plaintiff] did not file any grievances at Cape Vincent CF in 2015, and that the IGP Supervisor did not receive any correspondence from him prior to his transfer on 11/6/15." (Pl. Ex. 9).

The evidence established that Plaintiff was familiar with, and had previously utilized the grievance process at Cape Vincent. (Dkt. No. 70, at 7-8). Plaintiff believes he filed one grievance at Cape Vincent before the September 30, 2015 incident. (*Id.* at 7). Plaintiff knew that a grievance had to be filed within 21 days of an incident, and that a decision on the grievance could be appealed to CORC. (*Id.* at 8). CORC records reflect that Plaintiff had filed a total of 122 appeals with CORC. (*Id.* at 115-16; Def. Ex. 7).

Hartz testified that a grievance alleging excessive force by officers is taken to the superintendent and an investigation is done. (Dkt. No. 70, at 98-99). The superintendent has twenty-five days to respond. (*Id.* at 99). She testified that if an inmate does not receive a response to his grievance within twenty-five days he should "write to me" or he "could appeal it" to "the grievance clerk or the grievance office where the grievance was filed." (*Id.* at 100).

**C.     Analysis**

Defendants argue that Plaintiff provided inconsistent testimony which "renders him not credible with respect to whether he actually filed a grievance" and that, in any event, even if he did submit a grievance, he was obligated to appeal when he did not receive an answer. (Dkt. No. 72, at 8-10). Plaintiff argues that administrative remedies were unavailable to him because he submitted two timely grievances, but these grievances were never delivered to the grievance department at Cape Vincent. (Dkt. No. 73).

13

### 1.      Whether Plaintiff Submitted a Grievance at Cape Vincent

Having observed Plaintiff's demeanor and considered his testimony in connection with all the evidence, the Court finds that Plaintiff's testimony was credible. Plaintiff testified that he submitted two grievances shortly after he returned to the SHU, where he could write a grievance. (Dkt. No. 70, at 44). Plaintiff's testimony under oath on three different occasions was, for the most part, consistent. (*Id*. at 9-10, 49-50; Dkt. No. 39-2, at 60; Dkt. No. 39-3, at 13-14).[5]

Plaintiff's testimony is supported by repeated references to the grievances in documents written by Plaintiff while at Southport, including Plaintiff's letter to Cape Vincent after being transferred to Southport inquiring into the status of a "a grievance" he wrote "when [he] was at [Cape Vincent]," (Def. Ex. 1); Plaintiff's subsequent untimely grievance filed on November 27, 2015, where he references having filed "a grievance" and getting "no response," (Def. Ex. 4); and Plaintiff's letter to the Southport grievance official urging that his untimely grievance be filed because he does not know "if Cape Vincent Correctional Facility filed [his] original complaint," (Def. Ex. 3).

The Court has carefully considered Defendants' arguments. Although Defendants point to the fact that Plaintiff does not have any copies of the two grievances, Plaintiff credibly testified that he did not have access to carbon paper until he was transferred to Southport, (*id*., at 43), and Defendants have not contested this. Defendants also point to the memorandum written

---

[5] Defendants argue that "the Court should find that Plaintiff's inconsistent testimony renders him not credible with respect to whether he actually filed a grievance or multiple grievances about the September 30, 2015 incident." (Dkt. 72, at 8). Although Defendants have cited to some inconsistencies, including Plaintiff's testimony regarding whether he saw the officer who took his grievance, the inconsistencies are minor and the gist of Plaintiff's testimony was consistent. The caselaw cited by Defendants is inapposite. In *Armand v. Mosko*, the plaintiff provided three entirely conflicting stories explaining why there was no record of a grievance, and the plaintiff had written a letter admitting she never tried to file one at all. No. 13-cv-5, 2019 WL 2374948, at *4-5, 2019 U.S. Dist. LEXIS 63633, at *11-15 (W.D.N.Y. April 9, 2019). In *Adams v. O'Hara*, the court found that Plaintiff's hearing testimony lacked credibility due to, inter alia, the plaintiff's inconsistent testimony on numerous key issues and "unconvincing demeanor and body language." 16-cv-0527, 2019 WL 652409 at *5, 2019 U.S. Dist. LEXIS 24898, at *9-18 (N.D.N.Y. Feb. 15, 2019).

by Lt. Bass, reporting that Plaintiff said that "he didn't make a complaint; he had only said it to the captain," and that Plaintiff "was waiting to get out of the jail before he filed a complaint and didn't know it would be investigated." (*Id.*). Lt. Bass did not testify, and therefore the Court was unable to evaluate his credibility. However, Plaintiff denied making these statements, and the statements attributed to Plaintiff in Lt. Bass's report are not consistent with Plaintiff's documented attempts to pursue a grievance that he had written, including his inquiry to Hartz, (*see* Pl. Ex. 3) ("When I was at your facility I wrote a Grievance on a Assault that took Place in your box"), his grievance filed at Southport, (Pl. Ex. 6) ("I also Filed a grievance got no response"), and his letter regarding the Southport grievance, (Pl. Ex. 5) ("I do not know if Cape Vincent Correctional Facility Filed my original complaint"). The Court recognizes that, as Defendants argue, at the time of Lt. Bass's report Plaintiff still had time to file a grievance, and there is no indication in Lt. Bass's report that Plaintiff had not received a response about his grievance. However, in light of Plaintiff's documented attempts to pursue a grievance, the court credits Plaintiff's testimony that he did attempt to file a grievance at Cape Vincent.

    **2. Whether Grievance Procedures Were Available for an Unfiled and Unanswered Grievance**

Defendants argue, without discussing the Second Circuit's decision in *Williams*, that Plaintiff was obligated to appeal the lack of response to CORC or write to the grievance supervisor inquiring as to the status of his grievance. (Dkt. No. 72, at 8-10).

 Defendants argue that Plaintiff should have appealed to CORC after the twenty-five day deadline for the superintendent's response had passed. (*Id.* at 8). Defendants cite to the same DOCCS regulations that the court considered in *Williams*, § 701.6(g)(2) ("matters not decided within the time limits may be appealed to the next step") and § 701.8(g), ("If the superintendent fails to respond within the required 25 calendar day time limit the grievant may appeal his/her

grievance to CORC"). Defendants, however, fail to address the holding in *Williams* that the process for such an appeal is "'so opaque' and 'so confusing'" that it is practically unavailable. *Williams*, 829 F.3d at 124, 126 n.6. Section 701.8(g) contemplates *filed* grievances, and since the twenty-five day time period for the supervisor's response is triggered by "receipt of the grievance," the "regulations give no guidance whatsoever to an inmate whose grievance was never filed." 829 F.3d at 124. And, as the court in *Williams* noted, waiting twenty-five days for the superintendent's response leaves the inmate well beyond the twenty-one-day time period for filing a grievance. While an inmate can seek an exception to that twenty-one-day period, he has forty-five days to do so. Here Plaintiff was transferred to a different facility during the window of time in which he could have requested an extension. Plaintiff was transferred to Southport on November 6th, and the forty-five-day deadline for seeking permission to file a late grievance was November 14th. Plaintiff did seek permission to file a late grievance in his November 27th grievance and in his December 2nd letter request, asserting that he had filed a grievance that went unanswered, but that request was denied because it was outside the forty-five-day window. (Def. Ex. 3-6).

While Plaintiff was, by his own admission, familiar with the DOCCS grievance process, Plaintiff thought that he needed a decision to appeal to CORC. During his deposition, when asked if he appealed the grievances he submitted at Cape Vincent, Plaintiff replied "[w]ell you can't appeal if you don't get the grievance back." (Dkt. 39-3, at 17). This is consistent with his testimony at the hearing. At the hearing Defendants' counsel asked Plaintiff, "you knew that you had to get a decision on [a] grievance before anything else could happen," and he replied, "that's correct." (Dkt. No. 70, at 8). When Defendants' counsel then asked whether he "knew that once [he] got that decision, if [he] disagreed with it, [he] could appeal" to CORC, Plaintiff replied

"yes." (Dkt. No. 70, at 8). This is consistent with Form 2131, which contains the superintendent's decision and space for an "appeal statement" if the inmate seeks to appeal that decision to CORC. (Def. Ex. 5). There was no evidence in the record regarding the availability of Form 2133 to appeal an unfiled and unanswered grievance, the time period for filing any such appeal, or how CORC would review an inmate's appeal of an unfiled and unanswered grievance. Nor is there any evidence that, during the course of his attempt to grieve this incident, Plaintiff received any indication from DOCCS officials that he could appeal an unfiled and unanswered grievance to CORC.

In any event, Defendants' assertion that the appeal process under the DOCCS regulations was available for an unfiled and unanswered grievance must be rejected in light of *Williams*. *See Williams*, 829 F.3d at 126; *see also Woodward v. Lytle*, No. 16-cv-1174, 2018 WL 4643036, at *4, 2018 U.S. Dist. LEXIS 166404, at *13 (N.D.N.Y. Sept. 27, 2018); *Juarbe v. Carnegie*, No. 15-cv-1485, 2016 WL 6901277, at *1, 2016 U.S. Dist. LEXIS 162262, at *2, 10-12 (N.D.N.Y. Nov. 23, 2016).[6]

Defendants also rely on Hartz's testimony that if an inmate does not receive a response to his grievance within twenty-five days, he "should write to the grievance supervisor," or "appeal it." (Dkt. No. 70, at 99-100; Dkt. No. 72, at 8). Hartz cited to the handbook that all inmates receive regarding the grievance procedures "shortly after they get to the facility." (Dkt. No. 70, at 97; Def. Ex. 10). The handout, however, summarizes the DOCCS regulations considered in *Williams*. (*See* Def. Ex. 10) (noting that the superintendent has twenty-five days for harassment

---

[6] Defendants have not cited to any applicable caselaw support for their arguments. The Court does not consider the pre-*Williams* caselaw cited by Defendants. *See* (Dkt. No. 72, at 9) (citing *Mckinney v. Prack*, 170 F. Supp. 3d 510 (W.D.N.Y. 2016), *Parker v. McIntyre*, No. 11-cv-865, 2014 WL 5432153, 2014 U.S. Dist. LEXIS 151983 (W.D.N.Y. Oct. 27, 2014), and *Smith v. Kelly*, 985 F. Supp. 2d 275 (N.D.N.Y. 2013)). The case of *Shepherd v. Lempke*, No. 10-cv-1524, 2017 WL 1187858, 2017 U.S. Dist. LEXIS 48054 (N.D.N.Y. March 30, 2017) did not address *Williams*.

17

grievances and "if a timely decision is not received, [inmate] can appeal to CORC"); NYCRR tit.7, § 701.8(g) ("If the Superintendent fails to respond within the required 25 calendar day time limit the grievant my appeal his or her grievance to CORC."). Thus, Defendants' argument that the handout provided a process for appealing an unfiled grievance fails for the same reason their claim under the DOCCS regulations fail. With respect to Hartz's testimony that Plaintiff should have written to the grievance supervisor, Defendants have not provided evidence that this is part of any official grievance process, or recorded in any place such that inmates would be aware of it.

For the reasons stated above, the Court finds that Plaintiff did submit a timely grievance while incarcerated at Cape Vincent and that *Williams* governs here. Because "the process of appealing an unfiled grievance is practically unavailable to inmates under the current DOCCS regulations," by submitting a grievance, Plaintiff "exhausted all administrative remedies that were available to him." *Williams*, 829 F.3d at 126 n.6.

## IV.    CONCLUSION

For these reasons, it is hereby

**ORDERED** that Plaintiff's excessive force and failure to protect claims against Defendants may proceed to trial.

**IT IS SO ORDERED.**

Dated: December 9, 2020
         Syracuse, New York

_Brenda K Sannes_
Brenda K. Sannes
U.S. District Judge